**E-FILED**
Friday, 28 May, 2010  02:03:46 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, and its Local 2343,** )<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiffs,** ) | **Case No. 08-CV-2260** |
| v. )<br>) | |
| **ZF BOGE ELASTMETALL, LLC,** )<br>) | |
| **Defendant.** ) | |

**OPINION**

Plaintiff, International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America and its Local 2343, filed its Complaint (#1) against Defendant ZF Boge Elastmetall LLC on October 27, 2008. Defendant filed its Motion for Summary Judgment (#37) on December 18, 2009. The same day Plaintiff filed its Motion for Summary Judgment on Liability (#44). Response and Reply briefs on both motions have now been filed and the case is ready for judgment. For the following reasons, Defendant's Motion for Summary Judgment (#37) is GRANTED and Plaintiff's Motion for Summary Judgment on Liability (#44) is DENIED.

BACKGROUND

This action arises out of an alleged breach of a collective bargaining agreement (CBA) between and Defendant. The alleged breach occurred when Defendant closed its union-represented facility in Paris, Illinois, while keeping open a non-union facility in Hebron, Kentucky.

Plaintiff is a labor organization within the meaning of § 301 of the Labor Management Relations Act of 1947. Defendant is an employer within the meaning of § 301. At all material times to this suit, Defendant operated a union facility located in Paris, Illinois. Defendant also operated a non-union facility in Hebron, Kentucky. The Paris and Hebron facilities both produced rubber metal brushings, primarily for the automotive industry.

Plaintiff is the exclusive collective bargaining representative for a unit of production and maintenance employees employed at Defendant's Paris facility. Plaintiff and Defendant were parties to a CBA covering the Paris employees that was effective by its terms from April 3, 2005 through April 6, 2008. Article 3 of the CBA, titled "Management Rights," provided that Defendant had "the exclusive right in accordance with its judgment to ... sell, lease, or close down or expand the plant or parts thereof, and reduce, alter, combine, transfer or cease any department operation or service; determine the number, size [,] location and operation of plants and division, groups, and departments thereof; ... determine the schedules of production, the assignment of work and the size and composition of the workforce..."

Article 29[1] of the CBA provided: "Nothwithstanding anything else in this Agreement, no act, omission, or event occurring before the initial effective date or after the termination of the Agreement shall give rise to any rights or liabilities under this Agreement nor shall it be subject to arbitration."

---

[1] Defendant acknowledges that Exhibit J attached to Defendant's Motion for Summary Judgment mistakenly includes the corresponding Article 26 from the 2002-2005 CBA, but notes that Exhibits AAA and BBB, which were used by the parties as the working contract document for the 2008 CBA negotiations, reflect the correct article number of 29. Plaintiff did not object to this in its Response (#48), so the court will take Defendant's Undisputed Material Fact #9 from its Motion (#37) as a proper representation of Article 29 of the 2005-2008 CBA.

Greg White was the President and CEO of Defendant's North American operations, with responsibility for the Paris and Hebron facilities. Marc Vonderlage was the Plant Manager of the Paris facility. Bill Winschief was the President of the union Local 2343 and Gary Abernathy was the chair of the local union bargaining committee.

In early 2007, for economic reasons, Defendant began studying the potential consolidation of the Paris and Hebron facilities into a single facility located either in Paris or Hebron. On April 12, 2007, Defendant announced to employees that a consolidation was being studied, which stated:

> "With the significant operating losses in our business over the past few years and the outlook for future revenue and operating losses along with the ongoing challenges in our business environment from increased competition, rising material costs and pricing pressures from our customers, it does not appear realistic to maintain two North American manufacturing facilities. The study is evaluating consolidation or exiting of manufacturing operations in North America.
>
> ZF wants to continue manufacturing operations in the North American marketplace; however, it is not acceptable to continue to generate operating losses. Please know that the Company will consider all options and discuss this matter with all appropriate persons and parties.
>
> Whatever decision is taken, it is expected to be a three to four year process to execute any plan that is approved."

In April-May 2007 Defendant approached Plaintiff and requested to reopen the CBA to renegotiate six specific provisions or practices that Defendant deemed non-competitive. These six issues were: pensions (Article 17.1), shift overlap (Article 7.2), job selection (Article 10.4),

Family and Medical Leave (Article 14.2), the weekly payroll practice, and the remedy for overtime errors. In a notice to employees on May 10, 2007, Plant Manager Vonderlage advised employees that Defendant had identified certain "non competitive practices" in Paris that could be changed to help "reduce costs at the plant without causing significant financial impact to the employees."

Vonderlage further explained:

"This is the hourly workers' best opportunity to influence the consolidation decision in favor of the Paris plant. If these ideas are agreed to in some fashion between the union and the company the odds of the Paris plant are shifted in our favor. This will not be the only factor considered when making the decision between facilities, but it is an important issue being considered."

On May 11, 2007, union president Bill Winschief notified Greg White that the union members had "voted down opening the contract to renegotiate your six issues." Winschief stated, "I realize that your intent to negotiate these things was to give us a better chance of being the choice, but some people don't like chances, they want a sure bet, and you couldn't give me an answer." Further discussions ensued between Plaintiff and Defendant. On May 15, 2007, Vonderlage issued a written memorandum to employees regarding Defendant's request to bargain over the six issues. In the memorandum, Vonderlage stated that "Greg White wants to position this plant so that it has the best chance of being chosen to remain open and viable in the long term." He went on to state that "no changes that we negotiate with your elected representative for approval by Union members will take effect unless this plant is chosen to stay open." On May 22, 2007, the employees voted to proceed with bargaining over the issues

submitted by Defendant.

Plaintiff and Defendant subsequently engaged in negotiations over Defendant's proposed modifications to the CBA. In early June 2007, Plaintiff and Defendant reached an agreement, which was memorialized in a written agreement signed June 25, 2007, to modify the CBA in certain respects. The agreement set out in one column certain existing paragraphs of the CBA, and in a second column the language that would be substituted.

The agreement was captioned on each individual page:

"Agreements

ZF Boge Elastmetall/UAW 2343 regarding items discussed to influence the plant selection decision and long term viability of the Paris facility."

Regarding Article 17.1 (pension amounts), the parties agreed to freeze benefits effective January 1, 2008. Regarding Article 17.4 (401(k)), the parties agreed to an enhanced 401(k) plan, which included an increased match by Defendant and a defined contribution of 3% by Defendant for all employees, regardless of any contribution by the employee. For Article 7.2 (shift overlap), the parties agreed that Defendant could eliminate the shift overlap, or could use it as deemed appropriate. For Article 10.4 (job selection) the parties agreed to modify the existing language to provide Defendant with greater flexibility in assigning jobs. The parties also agreed to a biweekly payroll period and mandatory direct deposit. Further, there was agreement to require the five employees previously exempted from the union security clause to become union members within 30 days.

The parties agreed that the modifications agreed to would "not be implemented unless

Paris is chosen to remain in operation after the consolidation."[2] The 2007 agreement contained no specific duration clause but was intended to modify and follow the term of the CBA.[3] The 2007 agreement specified that the "items revised through this process will not be subject to change in the next contract negotiations." The 2007 agreement provided a timetable for implementation of the agreed modifications.

On June 20, 2007, Defendant announced to both the Hebron and Paris employees the decision to close the Hebron facility and "consolidate all operations into the Paris, Illinois facility." Defendant initiated the process of consolidation, began communicating with customers regarding the consolidation, transferring equipment from Hebron to Paris, allowing Hebron employees to transfer to other plants, and began preparing severance agreements for Hebron employees who stood to be displaced.

In February 2008, the parties began negotiations for a new collective bargaining agreement to replace the CBA that was set to expire on April 6, 2008. On April 2, 2008, union president Winschief sent Greg White the following e-mail:

> "I will be at negotiations Thursday, April 3. Like you said, we will finish this, tomorrow will be the last day of talks. As from what I have heard so far, it won't be good. But as far as Dennis Williams and Tony, (our rep), they can go fuck themselves. The bullshit is over. As far as I'm concerned, you can move the

---

[2]Defendant published a memo to its employees at this point advising them "if these topics are approved through your votes, they will only go into effect IF the Paris plant is chosen as the surviving facility. If Paris is NOT chosen, the bargaining unit will remain under the old agreement." (Emphasis in original).

[3]Plaintiff disputes that the 2007 agreement was "intended to modify and follow the term of the CBA."

shit back to Hebron and close the fucking plant and I got a lot of backing. We will see you on the street. Make sure you tell the Germans to go fuck themselves. As for your negotiations so far, that is a joke, just a waist [sic] of our money, there is no negotiating. We will not take nothing back to the people except yesterdays final offer."[4]

On April 6, 2008, following the expiration of the CBA, without a new agreement being reached, Plaintiff and employee members went on strike. On April 21, 2008, Plaintiff ended the strike and made an unconditional offer to return to work. Bargaining continued during the strike. Defendant notified Plaintiff that it was reconsidering its decision to consolidate the work in Paris and informed Plaintiff that it would engage in decision bargaining. In mid-to-late April 2008, following the decision bargaining, Defendant made a decision to reverse the consolidation process that was occurring in Paris and to close the Paris facility and consolidate in Hebron. On April 18, 2008, union bargaining chair Abernathy sent Winschief an email stating "Well, to let you know, the plant is closing, and we are starting on a closing agreement so we got what we asked for. The plant is moving to Hebron." Defendant began the process of closing Paris, and the Paris facility was closed by the end of 2009 (Hebron remains open as the surviving facility). Plaintiff never filed a grievance concerning Defendant's decision to close Paris (nor did it utilize the grievance procedure), but it did file unfair labor practice charges with the National Labor

---

[4]The parties are in dispute as to how involved and how much power Winschief had during the negotiations. Plaintiff points to the deposition testimony of Greg White, who testified that Winschief had said he was "cut out" of negotiations and would not be at the bargaining table on the union's behalf. However, Defendant argues that whether he was at the table or not, Winschief's power and influence as union president was significant and Winschief had negotiated the 2007 agreement on behalf of Plaintiff.

Relations Board, alleging that Defendant had failed to bargain in good faith and discriminated against its employees. Defendant contends it always bargained in good faith.

PROCEDURAL HISTORY

Plaintiff's Complaint (#1), filed on October 27, 2008, is premised on one central position: that the June 25, 2007 Agreement reached between Plaintiff and Defendant represented a promise by Plaintiff to accept and implement the modifications to the CBA sought by Defendant. As consideration for Plaintiff's acceptance of the modifications, Defendant would choose Paris as the surviving facility during consolidation. Defendant then implemented the modifications at the Paris facility, but when it came time to fulfill its part of the June 25, 2007 Agreement, Defendant breached the Agreement by announcing in April 2008 that the Paris facility would be closing. The Complaint contains two counts: Count I seeks damages for breach of contract due to Defendant breaching the June 25, 2007 Agreement when it announced closure of the Paris facility; Count II seeks specific performance of the June 25, 2007 Agreement in asking the court to order Defendant to keep the Paris facility open and operating.

Defendant filed its Motion for Summary Judgment (#37) on December 18, 2009. In its Motion, Defendant argues that summary judgment should be granted in its favor for three reasons: (1) the events giving rise to the lawsuit occurred after the CBA and all obligations under that agreement had terminated without renewal; (2) Plaintiff failed to exhaust its contractual remedies; and (3) Plaintiff is unable, as a matter of law, to establish any breach of contract. Plaintiff filed its Response (#48) on January 15, 2010, followed by Defendant's Reply (#50) on January 29, 2010. Defendant's Motion (#37) is now fully briefed and ready for the court's ruling.

On the same day that Defendant filed its Motion (#37), Plaintiff filed a Motion for Summary Judgment on Liability (#44). The arguments presented by Plaintiff in its Motion (#44) are the same it presented in its Response (#48) to Defendant's Motion (#37). Therefore, the two motions for summary judgment will be taken together and a granting of one will necessarily result in the denial of the other.

ANALYSIS

A. **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(b), "a party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).

B. **Did the 2007 Agreement constitute a separate contract or was it merely a modification to the existing Collective Bargaining Agreement?**

1. Arguments of the Parties

In its Motion for Summary Judgment, Defendant first contends that the 2007 Agreement was a mid-term modification of the CBA. In support of this contention, Defendant argues that it sought Plaintiff's consent to even engage in bargaining, which is consistent with § 158(d) of the

National Labor Relations Act (29 U.S.C. §§ 151-169), which requires a party seeking a modification of an agreement for fixed term to obtain the consent of the other party to begin bargaining. Further, Defendant argues the structure of the 2007 Agreement itself, which sets out existing contractual sections in one column and the modifications of those sections in a parallel column, reflects that it is integrated into the existing CBA and serves only to modify it. Defendant also points out that the 2007 Agreement had no duration clause, an essential element of any labor agreement. Logically, Defendant argues, the duration clause could only be supplied by classifying the 2007 Agreement as a modification of the CBA. Thus, as the 2007 Agreement was part of the CBA, any obligations contained in it expired with the CBA on April 6, 2008. Defendant argues there is nothing in the CBA that extends its obligations past the termination date and since Plaintiff's claims for breach only arise after the termination date, Defendant's decision to close the Paris facility is not actionable under a breach of contract theory.

   Plaintiff counters that the promise in the 2007 Agreement to keep the Paris plant open in exchange for Plaintiff agreeing to implement the CBA modifications did not contain an expiration date. Since the parties knew that consolidation of the Paris and Hebron plants could take three to four years, the 2007 Agreement was meant to outlast the 2005-2008 CBA and extend into the new CBA both parties anticipated would be negotiated in Spring 2008. Plaintiff claims that Defendant received a vested economic benefit once the 2007 Agreement modifications went into effect in Paris, and Defendant must be held to its bargain and promise that it would keep the Paris facility open. Plaintiff also claims that the parties agreement that none of the items agreed to in the 2007 Agreement would be re-negotiated in the 2008 CBA negotiations shows that the 2007 Agreement was meant to survive past the expiration of the

2006-2008 CBA.

    2.    <u>Decision of the Court</u>

The result on this issue turns on one key question: did the 2007 Agreement constitute a separate, stand-alone agreement, or was it a modification of the existing CBA. If it was a stand-alone agreement with no termination date, Defendant may have breached it when it failed to keep the Paris facility open following implementation of the modifications agreed to by Plaintiff. However, if the agreement was simply a modification of the existing CBA, the question becomes if the modification survived the expiration of the CBA on April 6, 2008. If it did not survive the CBA termination date, then Plaintiff's claim must fail and summary judgment should be granted for Defendant.

**Is the 2007 Agreement a modification of the CBA or a separate and independent contract?**

Upon a review of the filings and exhibits, the court finds Defendant's position, that the 2007 Agreement is a mere modification of the CBA, more persuasive. First, Plaintiff admits in its Complaint that the 2007 Agreement served to modify the CBA. Thus, the only issue to resolve is Plaintiff's contention that the agreement both modified the CBA *and* existed independent of the CBA.[5] A review of the actual 2007 Agreement, and the surrounding circumstances, indicates that the agreement was only meant to modify the existing contract and did not create an independent, separate contract.

The 2007 Agreement itself is almost exclusively concerned with modifications to the CBA. The agreement does state that the modifications will only be implemented if Paris is

---

[5]Paragraph 10 of Plaintiff's Complaint (#1) states: "As set forth below, the June 25, 2007 contract was entered into mid-term of the extant collective bargaining agreement referred to in ¶ 8, and it both modified and existed independent of that three year agreement."

chosen as the surviving facility, but the modifications are made with reference to the parallel provisions in the existing CBA. The agreement itself lists the modifications side-by-side with the existing CBA provisions. The 2007 Agreement leaves the general purpose and effect of the CBA undisturbed. Further, the 2007 Agreement contains no duration clause, which is an essential element of any labor agreement. See National Labor Relations Board v. Downs-Clark, Inc., 479 F.2d 546, 548 (5th Cir. 1973). The logical conclusion is that the duration of the 2007 Agreement was to be governed by the duration clause in the CBA, and that the agreement was simply a modification of the CBA as opposed to an independent contract. See Marine Transport Lines, Inc. v. International Organization of Masters, Mates, and Pilots, 878 F.2d 41 (2nd Cir. 1989).

      Another factor weighing in Defendant's favor is that Defendant sought Plaintiff's permission to even engage in bargaining, showing that the 2007 Agreement was intended to be a CBA modification by the parties. This is consistent with § 158(d) of the Act which does not allow a party to a CBA to modify the contract without first receiving the permission of the other party to begin negotiating. 29 U.S.C. § 158(d).

      The specific provisions at issue in 2007 were modifications of similar provisions already contained in the CBA. There is no evidence that the parties intended to create a wholly separate and independent new contract. Although a new element was introduced (i.e., the promise not implement the modifications unless Paris is chosen to remain in operation after the consolidation), the general purpose and effect of the existing CBA was not disturbed. See Chicago College of Osteopathic Medicine v. George A. Fuller Co., 776 F.2d 198, 208 (7th Cir. 1985) ("A modification of a contract is a change in one or more respects which introduces new

elements into the details of the contract, cancels some of them, but leaves the general purpose and effect undisturbed."). For all the reasons stated, this court concludes that the 2007 Agreement is a modification of the 2005-2008 CBA.

**Does the 2007 Agreement modification survive the April 6, 2008 expiration of the CBA?**

The court further agrees with Defendant that the 2007 Agreement, as a modification of the CBA, did not survive the CBA termination date of April 6, 2008. Thus, all obligations owed under the agreement terminated with the expiration of the CBA. As a general rule,

> "an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied. Although after expiration most terms and conditions of employment are not subject to unilateral change, in order to protect the statutory right to bargain, those terms and conditions no longer have force by virtue of contract." Litton Financial Printing Division v. National Labor Relations Board, 501 U.S. 190, 206 (1991).

Further, the Second Circuit has stated that "[t]he terms of an expired agreement thus retain legal significance because they define the status quo. Rights and duties under a collective bargaining agreement do not otherwise survive the contract's termination at an agreed expiration date." Derrico v. Sheehan Emergency Hospital, 844 F.2d 22, 26-27 (2nd Cir. 1988). The CBA itself between the parties makes clear whether any rights included in the CBA vested so as to extend beyond the date of the CBA's expiration. Article 29.1 of the CBA states:

> "Nothwithstanding anything else in this Agreement, no act, omission, or event occurring before the initial effective date or after the termination of the

Agreement shall give rise to any rights or liabilities under this Agreement nor shall it be subject to arbitration." Further, paragraph E on page 20 of the CBA states "the arbitrator shall have no authority to rule on anything that happens before the initial date of this Agreement or after the termination date of this Agreement."

It is clear from the face of the CBA, of which the 2007 Agreement is a part, that the parties did not intend for any obligations to vest and extend beyond the termination date of April 6, 2008. While Plaintiff claims that an obligation to keep the Paris plant open vested in the 2007 Agreement once the modifications we were implemented, there is no language contained in the 2007 Agreement that extends its obligations beyond April 6, 2008. As stated above, the logical conclusion is that as the 2007 Agreement was a part of the CBA, any obligations contained in the Agreement would expire with the CBA. It was announced that Paris was chosen to remain in operation after consolidation, and the modifications agreed to in 2007 were implemented. On April 6, 2008, the CBA expired. Negotiations for a new CBA broke down in acrimony (see the language in union president Winschief's email of April 2, 2008) and Plaintiff went on strike. At this point, neither party had any continuing obligation to the other under the old, expired CBA. Plaintiff went on strike and Defendant decided to close the Paris plant and consolidate in Hebron. As there was no longer a governing, functioning CBA, neither party could be in breach.

Nor do any of Plaintiff's other arguments prevail. Plaintiff cites to <u>Marine Transport</u> in support of its argument that the 2007 Agreement survived the expiration of the CBA. In <u>Marine Transport</u>, the employer negotiated a mid-term modification to a CBA (called the Sealift Agreement) with the union, and one of the Sealift Agreement provisions contained language that

-14-

had a termination date of May 7, 1985, a date after the CBA or "Master Agreement" between the parties terminated.  Plaintiff argues that here, just as in Marine Transport, "there is no question that all the terms contained in the 2007 Agreement were to survive the expiration of the CBA" just as the Marine Transport court found that the mid-term Sealift Agreement extended the duration of the CBA with regards to the items contained in the Sealift Agreement.  The court found that, while the parties did not state the Sealift Agreement would extend the CBA, that was "no obstacle" to the conclusion that CBA would be extended because that is clearly what the parties wanted.  Marine Transport, 878 F.2d at 44-45.  However, Defendant correctly points out that, in Marine Transport, the Sealift Agreement actually contained a provision modification that acted to extend the duration clause of the CBA to specific date (May 7, 1985).  Marine Transport, 878 F.2d at 46. Therefore, it was clear and without question that, once the court found it to be a modification, the parties intended for the CBA to be extended.  In this case, however, there is no such clause contained in the 2007 Agreement showing that the parties intended for it to continue past the April 6, 2008 expiration date of the CBA.  Rather, the evidence from the face of the 2007 Agreement itself and the CBA shows that the Agreement, as a modification of the CBA, was to expire with the CBA.

Plaintiff also cites to Bidlack v. Wheelbrator Corp., 993 F.2d 603 (7th Cir. 1993), where the Seventh Circuit held that absence from the CBA of any provision that explicitly vested benefits of retired employees did not defeat the employees' claim where agreements were ambiguous on the issue and there existed extrinsic evidence to the contrary.  Bidlack, 993 F.2d at 609.  Plaintiff uses Bidlack to advance its argument that the 2007 Agreement is ambiguous as to termination of its obligations, and that extrinsic evidence should be allowed in, and that evidence

would show that, since the parties knew the consolidation of the plants could take three to four years, and Defendant promised the Paris plant would remain open, it is clear the 2007 Agreement did not expire with the CBA. However, Bidlack also states that if a CBA is completely silent on the duration of a provision, extrinsic evidence should not be allowed in to show a perpetual continuation of a provision. See Bidlack, 993 F.2d at 608. "[C]ourts should cast a cold eye on contentions that a contract with a fixed term actually created a perpetual obligation" and should "presume that a collective bargaining agreement ceases to obligate the employer when the agreement's term (invariably three years) is up." Bidlack, 993 F.2d at 606-07. While this presumption is rebuttable, silence alone is inadequate to rebut the presumption. Bidlack, 993 F.2d at 608.

    In the instant case there is more than mere silence. There is a clear termination date of April 6, 2008 for obligations contained in the CBA. There is nothing in the 2007 Agreement explicitly extending the agreement past the expiration date of the CBA. However, the court has already above determined that the 2007 Agreement was a modification and thus a part of the CBA. Once it became a part of the CBA, it was bound by its terms regarding expiration. Article 29.1 of the CBA clearly states that it terminates on April 6, 2008, and that "no act, omission, or event occurring before the initial effective date or after the termination of the Agreement shall give rise to any rights or liabilities under this Agreement..." As the CBA had expired when Defendant made its April 18, 2008 decision to close the Paris plant and consolidate in Hebron, it was under no obligation to Plaintiff to keep the plant open. Thus, no breach of the 2007 Agreement occurred.

    IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#37) is GRANTED in full.

(2) Plaintiff's Motion for Summary Judgment on Liability (#44) is DENIED in full.

(3) This case is terminated.

ENTERED this 28th day of May, 2010

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE